RICHARD T. BISHOP, Respondent, v. THEODORE HUNT, Appellant.

| 24 | 373 |
|---|---|
| 94 | ²436 |

St. Louis Court of Appeals, January 18, 1887.

1. PRACTICE—WEIGHT OF EVIDENCE.—The finding of a jury, under correct instructions, that a contracting defendant was sane when he executed the contract, will not be disturbed, on appeal, on the sole ground that it is against the weight of evidence.

2. ―――― MISCONDUCT OF ATTORNEY.—The conduct of an attorney in making, in his argument, remarks designed to prejudice the jury and which are unwarranted by the evidence, is ground for reversing a finding which appears to be against the weight of the evidence.

APPEAL from the St. Louis Circuit Court, SHEPARD BARCLAY, Judge.

*Reversed and remanded.*

NAPTON & FROST, for the appellant.

G. A. WURDEMAN, for the respondent.

LEWIS, P. J., delivered the opinion of the court.

This is a suit on a promissory note for five hundred dollars, given in the purchase of several patent rights by the defendant from the plaintiff. The answer set up the defence that the defendant was *non compos mentis* when

the note was given, and that the same was obtained by false and fraudulent representations of the plaintiff. The court, of its own motion, gave the following instruction to the jury :

"The court instructs you that, if you · find and believe from the evidence that, on May 16, A. D., 1885, the defendant was unsound of mind to such extent as to be incapable of appreciating the character of the transaction in which the note (read in evidence) was given, then your verdict should be for the defendant, whether you also find that the plaintiff then believed him to be of sound mind, or not ; but unless you find the defendant was then of unsound mind, as aforesaid, your verdict should be for the plaintiff, for the sum of $511.89."

The verdict and judgment were for the plaintff.

There is a discrepancy of dates repeated frequently through the record, which would be somewhat embarrassing, but for the evident fact that it results from inexcusable errors in copying. The trial occured on January 12, 1886, and yet nearly every witness is written down as testifying to what was done in March or May, 1886. The same year (1886) is given to events which were contemporaneous with the writing of a letter offered in evidence, and which bore the date "May 29, 1885." The repeated clerical blunder is so patent, that we feel constrained to substitute the year 1885 for "1886," wherever this may be necessary to make the record either intelligible or consistent.

Dr. T. G. Comstock, a well known physician, testified that he saw the defendant at St. Vincent's asylum for the insane, on May 29, 1885, the day on which, by advice of the witness, the defendant was committed to the asylum. That he made a thorough examination of the defendant, and found him insane on the subject of patents. From the defendant's then condition, the witness was satisfied that the insanity had existed for more than three weeks prior to that date.

William Booth, the defendant's father-in-law, testi-

fied, that for several months prior to May, 1885, the defendant had been insane on the subject of patents. That he "would buy them, talk foolishly about them, and the immense sums he expected to realize on them. The defendant wrote letters about patents, of a foolish nature, to Bismarck and the Czar of Russia."

Fred. G. Ziebig had known the defendant from childhood. Attended to the real estate business of the defendant's mother, and had attended to the defendant's business until March, 1885, when he had ceased to do so because of the defendant's insanity and the witness's unwillingness to incur the responsibility of carrying out his instructions. Saw the defendant nearly every day up to May 29, 1885, and he was insane during the whole time, particularly on the subject of patents, from which he expected to make an extravagant fortune. The defendant, on the sixteenth day of May, 1885, was not competent to transact any business, by reason of insanity.

A letter from the plaintiff to the defendant's wife, dated May 29, 1885, was shown in evidence, in which the plaintiff says he was somewhat surprised to learn of the defendant's "sickness," and also of his financial position. That, when he accepted the note for five hundred dollars, he believed the defendant to be in all respects responsible. That the writer had not, in any one instance, pressed or persuaded the defendant either to patent an invention, or to buy one after it was patented. That all he (the plaintiff) now asked was, to have his patent deeds returned, and he would return the note.

The only testimony offered by the plaintiff was that given by himself. The bill of exceptions recites that the plaintiff was duly sworn, "and gave evidence tending to prove that the defendant was sane and capable of contracting before and at the time of the execution of the said note; that he saw no reason to believe or suppose the defendant to be insane ; that the note was signed by the defendant in payment of certain patents. They were valuable then, and

now.   When he heard the defendant was in the asylum, he wrote to the defendant's wife, tendering the note and asking for a return of his patents.   To this letter he got no reply, and brought suit accordingly.   He had then an opportunity to sell the patents to another party, but could no longer do so."

It will hardly be denied that this testimony strongly preponderates on the side of the defendant.   On the one hand, we have circumstantial, positive, and direct evidence from unimpeached witnesses, who were in the best possible position to know, of a mind diseased in its workings upon the very subject matter of the contract whose validity is attacked on that account.   Friends, relatives, and a distinguished physician all agree that the defendant was unquestionably insane about the values of patent rights, before, after, and at the time when he purchased seven of them with the note in suit. Even the plaintiff would appear to have been convinced of the fact at one time, and that after the transaction and before he gave his testimony, when he wrote the letter to Mrs. Hunt.   Against these convincing circumstances there is opposed only a vague account from the plaintiff of some fact or facts (not detailed, nor even remotely suggested) " tending to prove" that the defendant was sane when he executed the note.   There is no reason to doubt that the plaintiff acted in perfect good faith, and that he fully believed the defendant to be of sound mind when he made the purchase.   This, however, would be no answer to the defence of actual insanity existing at the time.   It is a fact of universal knowledge, that the most confirmed lunatics, in many cases, impose upon intelligent people impressions of their perfect sanity ; and  this oftenest occurs with monomaniacs.   Direct proof of a single act manifesting insanity is of far more convincing weight to establish the mental disease, than any number of interviews or observations, in which no such manifestation appears, can be to show the contrary.

But, notwithstanding all these important considerations, we might, in view of the discordant state of the testimony, and of the instruction above copied, which correctly states the law (*Tolson v. Garner*, 15 Mo. 494), properly refuse to disturb the verdict, if no influence positively tending to give it an improper direction were apparent elsewhere in the record. We think there was such an influence in the present case; one which in many cases might be harmless, but which, when considered with the strong evidential tendencies against the verdict rendered, would seem, with at least a tangible probability, to have had a potential agency in the shaping of the result.

In the course of the argument, the plaintiff's counsel told the jury that the "plaintiff was a poor man, with a family dependent upon him for support, and that the defendant belonged to one of the wealthiest, most influential, and prominent families of St. Louis." The defendant's counsel objected to this language, to which objection the only response made by the court was a direction to the plaintiff's counsel to "keep to the facts of the case."

It has been repeatedly declared by the supreme court, and by this court, that it is highly improper for counsel to state to the jury facts which do not appear in the evidence, as having a bearing upon the way the verdict ought to go. *Lloyd v. Railroad,* 53 Mo. 509; *The State v. Kring,* 64 Mo. 591; *Roeder v. Studt,* 12 Mo. App. 566; *Marble v. Walters,* 19 Mo. App. 134. The wrong is all the more flagrant, when it appeals to supposed prejudices of the jury, which may possibly lead them to disregard the real merits of the controversy. Such was the appeal made by the plaintiff's counsel in the instance before us. The only proper remedy in all cases, when objection is made, is a prompt rebuke from the court, which shall be so emphatic as to strongly impress the jury with the unfairness of the procedure, and to deter

them from giving the least weight to an argument so hostile to the pure administration of justice. The placid direction in general terms, given by the court on this occasion, was anything but a suitable preventive for the mischief to be avoided. Upon the whole record, we are unable to conclude that the verdict was fairly reached by the jury upon the testimony and the instructions.

The judgment is, therefore, reversed and the cause remanded, with the concurrence of all the judges.